IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINA LATE and NATHAN ARMOLT, as parents and natural guardians of D.A., a minor, and in their own right, | : : : : : | Civ. No. 1:13-CV-0756 |
| Plaintiffs, | : : | |
| v. | : : | |
| UNITED STATES OF AMERICA, | : : | |
| Defendant. | : | Judge Sylvia H. Rambo |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

**I.     Background**

On March 22, 2013, Plaintiffs filed a complaint against the United States pursuant to 42 U.S.C. § 1346(b)(1) of the Federal Tort Claims Act related to injuries sustained by minor-Plaintiff D.A. during his birth. (Doc. 1.) After unsuccessful attempts at mediation and settlement (Docs. 9 & 46), and a subsequent two-year stay to allow more time to accurately gauge D.A.'s development and the effects of his brain injury (Doc. 53), a six-day bench trial commenced on September 19, 2016. Based on the evidence submitted at that trial, the court now sets forth its findings of fact and conclusions of law.

## II. Findings of Fact

### Pregnancy and Birth of D.A

1. D.A. was born on February 21, 2012 at Keystone Women's Health Center, a federally supported community health center.

2. Plaintiffs Christina Late and Nathan Armolt are the parents and natural guardians of D.A.

3. Ms. Late graduated high school in 2003 and subsequently attended Shippensburg University for one year. She then obtained a diploma in medical billing, coding, and transcription from the Computer Learning Network. Ms. Late has worked as a service professional at Olive Garden restaurant for nine years, and is a full-time employee.

4. Mr. Armolt is a high school graduate and is employed as a distribution professional in an Amazon warehouse.

5. Dr. Thomas Orndorf is an obstetrician employed by Keystone Women's Health Center and was an employee of the United States.

6. Dr. Orndorf delivered D.A. on February 21, 2012.

7. During prenatal care, Ms. Late was also under the care of Hilary Ginter, M.D., who is board-certified in obstetrics and gynecology.

8. Throughout Ms. Late's prenatal care with Keystone Women's Health Center her pregnancy was normal.

9. Sometime before 10 p.m. on February 20, 2012, Ms. Late presented at Chambersburg Hospital with complaints of contractions and leaking of fluid.

10. Dr. Ginter was the attending physician on-call between 6 p.m. and 7 a.m. the following morning. Dr. Ginter stayed at the hospital while on call.

11. During the initial six hours of labor after admission, Ms. Late had regular contractions. Ms. Late also had two episodes of vomiting during contractions, a symptom she also experienced during the delivery of her first child.

12. Dr. Ginter testified she had no concerns with respect to Ms. Late's progress at any time during the night. Ms. Late had a normal labor curve throughout the night, with normal progress of dilation and station.

13. Dr. Ginter also testified she did not have any concerns regarding the fetal heart tracings or fetal well-being at any time.

14. At 7 a.m., Dr. Orndorf assumed physician care of Ms. Late.

15. Neither Dr. Orndorf nor any of the nurses expressed any concern regarding Ms. Late's labor or progress, or about the baby's heart rate or that the baby was "stuck."

16. Dr. Orndorf did not explain to Ms. Late that any type of intervention was necessary, including the use of forceps.

17. At 7:39 a.m., after only one push, Dr. Orndorf applied Laufe forceps.

18. Dr. Orndorf pulled once and then removed the forceps.

19. Although the baby was not yet crowning, Dr. Orndorf re-applied the forceps and forcefully pulled three more times. During this period, Dr. Orndorf was straining, red-faced and sweaty.

20. Dr. Orndorf removed the forceps. With maternal pushing, baby D.A. was delivered.

21. D.A. weighed 3,909 grams at birth. At one minute, he had an Apgar of 7; at five minutes, his Apgar score was 9.

22. Upon initial assessment, D.A.'s head showed moulding and forceps marks.

23. Dr. Orndorf admitted that Ms. Late made normal progress during the three stages of labor.

24. Dr. Orndorf admitted that progress from a -1 station at 5:31 a.m. to a +1 station at 7:30 a.m. reflected a good rate of descent.

25. Dr. Orndorf admitted it is common in labor to have variable decelerations and late decelerations. He also admitted that a return to baseline, accelerations, and good variability after a deceleration in fetal heart rate are reassuring and normal. He also admitted that Category 2 decelerations are common in labor.

26. Dr. Orndorf admitted vomiting is a common occurrence for women in labor, which does not raise any concerns.

27. Dr. Orndorf admitted that, when he began the delivery, the fetal heart tracings were reassuring with accelerations of more than ten beats per minute and variability.

28. Dr. Orndorf admitted that, at 7:30 a.m., there was no concern for immediate fetal compromise.

29. Dr. Orndorf also admitted that he had no concern about the adequacy of Ms. Late's pushing or her efforts in pushing.

30. Dr. Orndorf admitted that forceps can increase the risk of injury to mom and baby.

31. Dr. Orndorf also admitted that the higher the baby is positioned in the birth canal at the time forceps is applied, the risk of injury is also higher.

32. Dr. Orndorf admitted he expected Ms. Late to have an easy delivery.

33. Dr. Orndorf admitted protraction of the first stage of labor is never an appropriate indication for forceps delivery.

34. Dr. Orndorf admitted the policy at Chambersburg Hospital and at Keystone Women's Health Center was to use the American College of Obstetrics and Gynecology guidelines as best practices.

35. Dr. Orndorf admitted that American College of Obstetrics and Gynecology guidelines provide the only indications for a forceps delivery is a

5

prolonged second stage, where the mother is pushing for two hours, concern over maternal effort, and suspicion of immediate potential fetal compromise.

36. Dr. Orndorf stated there was no prolonged second stage, no concern for maternal effort, and no suspicion of immediate fetal compromise. Also, Dr. Orndorf applied forceps at 7:39 a.m., while D.A. was at +1 station, which is considered a "mid-forceps" delivery that poses a higher risk to the baby.

37. Dr. Orndorf testified that, following birth, D.A.'s Apgar scores were normal at one minute and five minutes. He admitted that he had no concerns about baby D.A.'s well-being at the time, or about any pre-labor injury. Dr. Orndorf testified that he did not order a lab test for cord blood gas, as he had no concerns about D.A. having suffered hypoxia.

## **Dr. Orndorf's Negligence**

38. Dr. Andrew Gerson is a board-certified obstetrician-gynecologist with a subspecialty in maternal-fetal medicine. Maternal-fetal medicine focuses upon risks to the mother and child during pregnancy.

39. Dr. Gerson serves as a peer reviewer for both Obstetrics and Gynecology and the American Journal of Obstetrics and Gynecology. A peer reviewer is a physician recognized as an authority in a specific area of medicine.

40. Dr. Gerson is also familiar with the standard of care for an obstetrician performing an operative delivery with forceps.

6

41. The court qualified Dr. Gerson as an expert in obstetrics and maternal-fetal medicine, and finds that Dr. Gerson provided all of his opinion testimony to a reasonable degree of medical certainty.

42. Dr. Gerson testified that D.A.'s fetal heart tracings from 10 p.m. until 7 a.m. were normal with minimal or moderate variability, which predicted a vigorous, well-oxygenated baby that one would expect to have normal Apgar scores, as D.A. did.

43. Dr. Gerson stated that intermittent decelerations are typical in 95 percent of labors. Nothing in the tracings during any part of the labor raised any unusual concerns.

44. Dr. Gerson testified that mid-forceps deliveries are only indicated under severe emergencies that are either life threatening to the mother or to the baby because of the high and frequent risk of harm, including a high rate of skull fractures.

45. Dr. Gerson noted that Dr. Orndorf admitted at his deposition that his delivery of D.A. was a mid-forceps delivery.

46. Dr. Gerson testified that the fetal heart tracings remained reassuring up until delivery and did not indicate a need for intervention.

47. There was never a risk of immediate fetal jeopardy during the course of Ms. Late's labor.

48. Dr. Gerson opined that Dr. Orndorf deviated from the standard of care because neither the mother nor baby suffered from any condition for which use of forceps was indicated.

49. Dr. Gerson noted that forceps delivery when the baby is occiput posterior, like D.A. was, has a 2.5 times increase in the risk of birth trauma.

50. Dr. Gerson described how forceps are to be applied and that the application of forceps to D.A. deviated from the standard of care and caused his skull fractures.

## **D.A.'s Injuries and Developmental Issues**

51. Dr. Neal Madan qualified as an expert in pediatric neuroradiology, and all of his opinions were given to a reasonable degree of medical certainty.

52. Dr. Mark Dias qualified as an expert in pediatric neurological surgery and neurotrama, and all of his opinions were given to a reasonable degree of medical certainty.

53. Dr. Eric Marsh qualified as an expert in pediatric neurology with special qualifications in child neurology, clinical neurophysiology and pediatrics, and all of his opinions were given to a reasonable degree of medical certainty.

54. Plaintiffs' medical experts opined that Dr. Orndorf's traumatic forceps delivery caused D.A. multiple skull fractures, pervasive bleeding in the brain, and severe destruction to the cerebellum and brain stem. These injuries caused D.A. to

suffer breathing difficulties, seizures, headaches, inability to sleep, and multiple brain surgeries.

55. As a result of his traumatic birth, D.A. suffered fractures of the occipital and parietal bones, which in turn caused extensive bleeding within the cerebellum. The resulting hydrocephalus, hemorrhaging, and swelling in D.A.'s brain created a mass effect, pushing the brain stem against his skull and causing an acquired Chiari malformation as well as encephalomalacia, which is permanent damage to large areas of his brain's white matter.

56. As a result of the hydrocephalus, D.A. had to have a shunt placed in his brain to drain the excess fluid.

57. To date D.A. has had six brain surgeries and is at risk of needing shunt revisions that will require future surgeries.

58. Dr. Marsh opined that D.A.'s brain will never recover from its injuries. The brain is incapable of healing because there is no re-cell growth. D.A. will suffer from dysmetria, ataxia, and hemiparesis his entire life. He will always have mis-coordination of limb movements, uneven gait, and weakness on his right side, which will limit his ability to function.

59. Although he may make some progress, he will not become neurotypical.

60. Dr. Lee Ann Annotti qualified as an expert in psychology, neuropsychological evaluations, and psychoeducational assessments of children, and all of her opinions were given to a reasonable degree of medical certainty.

61. Dr. Annotti stated that D.A. has delays in communication, including expressive communication, and has deficits with social-emotional functioning, adaptive functioning, problem-solving cognition, and motor development.

62. Dr. Annotti concluded that D.A. deficits are pervasive and will impact him for his entire life.

63. D.A. understands language, but is unable to express himself, reason or use language appropriately.

64. D.A. is operating at a 50% delay with respect to abstract reasoning, problem solving, and cognitive skills that are very important to functioning in the world.

## **D.A.'s Future Prognosis**

65. D.A. has and will continue to have severe intellectual disability which will require life-long supervision and likely residential placement in an appropriate facility.

66. D.A. has and will continue to have significant deficits in social-emotional, motor, and cognitive functioning that negatively affects his

development currently and will continue to negatively affect his functioning over his lifetime.

67. D.A. will not be able to live independently.

68. D.A. will not be able to functionally read, write, or solve abstract problems.

69. D.A. will not be able to manage his adult life, care for himself, or manage his personal finances.

70. D.A. will be unable to drive a car.

71. D.A. fatigues quickly and currently relies on a stroller. In the future, D.A. will need a motorized wheelchair as he is too weak to roll a wheelchair himself. He will also require a van capable of transporting the motorized wheelchair.

72. D.A.'s most profound weaknesses are in executive functioning, memory, language skills, motor skills, social-emotional, sensorimotor functioning and sensory weaknesses.

73. D.A.'s language skills will impact his relationships as he will be unable to communicate and have conversations with same age peers. He will be unable to participate in a relationship that requires mutual give and take and mutual understanding.

74. Although D.A. does not have autism, he displays autistic behavior.

75. As D.A. has grown older, he has continued to have aggressive emotional outbursts, including crying and striking his parents, sibling, and teachers.

76. As of May 2014, D.A.'s life expectancy was an additional 74.8 years, his father's life expectancy was an additional 40.3 years, and his mother's was an additional 52.9 years.

77. D.A. is expected to outlive both of his parents by approximately 22 years.

78. The court finds that at age 22, D.A. will be too difficult for his parents to handle in the home and he will be required to go to an assisted living facility for care.

79. D.A. will require physical, vocational, and speech therapy, as well as counseling, at least up until age 22.

80. Mona Yudkoff qualified as an expert in rehabilitative nursing, case management and life care plans, pediatric rehabilitative nursing, and pediatric case management and healthcare plans, without objection from defense counsel.

81. A life care plan is a determination of what services are required for an individual to function that would not have been required absent a specific injury.

82. In preparation for her life care plan for D.A., Ms. Yudkoff reviewed medical records, expert reports, school records, and therapy notes.

83. The life care plan prepared by Ms. Yudkoff is reasonable and medically necessary.

84. D.A. will require medical surveillance by various physicians in the nature of neurological testing, shunt replacement, orthopedics, and MRIs.

85. D.A. will require behavioral, educational, and language therapies during school years, from age 4 to 21.

86. D.A.'s parents will require counseling to cope with D.A.'s behavioral and educational modifications until he is age 22.

87. Attendant care will be required to supervise D.A. after school and on non-school days.

88. D.A. will require placement in a long term care facility by age 22.

89. D.A. will require future surgeries related to his shunt.

## Damages

90. Plaintiffs have incurred $103,967.10 in past medical expenses caused by D.A.'s birth injuries.

91. Plaintiffs will incur $200,000 in future medical costs for future surgeries on D.A.'s brain.

92. D.A. will require future medical surveillance in the nature of neurological testing, shunt replacement, opthamological exams, orthopedics, and MRIs as follows:

a. From age 4 to 21, $1,910 per year for a total of $34,380.

b. From age 22 to life, $1,071 per year for an estimated 54.9 years for a total of $58,797.90.

93. D.A. will require behavioral, educational, language and other therapies during his school years from age 4 to 21 at an annual cost of $69,984 for a total of $1,259,712.

94. D.A. will require attendant care to aid in his supervision and care at a discounted annual rate of $25,184 while D.A. is age 4 to 12, for a total of $226,656, and then at an annual rate of $49,634 for ages 13 to 21 for a total of $446,706.

95. From age 22 to life (a period estimated to last 54.9 years), D.A. will require placement at a long term care facility at a rate of $128,480 per year for a total of $7,053,552.

96. When D.A. enters a long term care facility, he will no longer need outside behavioral, educational, language, and other therapies, nor will he require case management not provided by the facility.

97. The total present-day cost of D.A.'s future medical and attendant care, based on the report of Ms. Yudkoff minus the deductions stated in Paragraph 96 of this memorandum, is $9,279,803.90.

98. The future value of D.A.'s economic damages contained in his life care plan, as calculated by Mr. Lally on a year-by-year basis, minus the reductions stated in Paragraph 96 of this memorandum, is $32,994,383.50.

99. D.A. has lost his ability to earn wages from gainful employment in the future, and has lost the opportunity to receive the fringe benefits that would have been associated with his future employment. The court finds that D.A.'s lost earning potential is based on his attainment of an associate's degree and being employed during his work life expectancy.

100. D.A. has endured past pain and suffering, and will suffer from pain, embarrassment, humiliation, and loss of life's pleasures in the future. D.A.'s injuries occurred at birth and will cause him to suffer for the entirety of his life. The brain injuries are severe, permanent, and will prevent D.A. from performing life's basic functions and caring for himself.

101. D.A.'s disfigurement is permanent in the form of a large scar on the back of his head due to his brain surgeries, and his shunt drainage tubing is visible under his skin. D.A. is also disfigured in the form of both increased and decreased tone, which causes him weakness on his right side as well as an uneven gait.

**III.   Conclusions of Law**

1. The parties do not dispute that Pennsylvania law applies to Plaintiffs' medical malpractice claim, which sounds in negligence.

2. Under Pennsylvania law, a plaintiff in a medical malpractice action must establish: (1) a duty owed by the physician to the patient; (2) that the physician breached that duty; (3) that the breach was a proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the patient suffered damages as a direct result of the harm. *See Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003).

3. The Pennsylvania Medical Care Availability and Reduction of Error Act ("MCARE") allows for plaintiffs in a medical malpractice action to recover both economic and non-economic losses. *See* 40 Pa. Cons. Stat. § 1303.509. MCARE provides that the trier of fact shall make separate determinations for loss of earnings, past and future non-economic damages, and past medical and other related expenses in lump sums, as well as future medical and related expenses by year. *See id.*

4. When considering future damages, the trier of fact "may incorporate into any future medical expense award adjustments to account for reasonably anticipated inflation and medical care improvements as presented by competent evidence." *Id.* at § 1303.509(b)(2). "In the context of a claim for future medical

16

expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable estimated cost of such services." *Keifer v. Reinhart Foodservices, LLC*, 563 F. App'x 112, 116 (3d Cir. 2014) (quoting *Mendralla v. Weaver Corp.*, 703 A.2d 480, 485 (Pa. Super. Ct. 1997)).

    5. As to non-economic damages, the trier of fact may award damages based on the plaintiff's pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasures of life, and disfigurement. *See Catlin v. Hamburg*, 56 A.3d 914, 924-25 (Pa. Super. Ct. 2012). In determining the amount of damages, the trier of fact is to consider:

> (1) the age of the plaintiff; (2) the severity of the injuries; (3) whether the injuries are temporary or permanent; (4) the extent to which the injuries affect the ability of the plaintiff to perform basic activities of daily living and other activities in which the plaintiff previously engaged; (5) the duration and nature of medical treatment; (6) the duration and extent of the physical pain and mental anguish which the plaintiff has experienced in the past and will experience in the future; (7) the health and physical condition of the plaintiff prior to the injuries; and (8) in case of disfigurement, the nature of the disfigurement and the consequences for the plaintiff.

Pa. R. C. P. 223.3.

    6. Dr. Orndorf was acting within the scope of his employment when he delivered D.A. through the unnecessary use of forceps.

    7. Dr. Orndorf's delivery of D.A. on February 21, 2012 fell below the standard of care and as such was negligent.

8. Dr. Orndorf's negligence was a direct and substantial factor in causing D.A.'s injuries.

9. D.A. suffered harm and resultant damages from the injuries inflicted upon him by Dr. Orndorf.

10. Pursuant to the FTCA, Dr. Orndorf was an employee of the United States, and the United States is thereby liable for his negligent conduct within the scope of his employment. *See* 28 U.S.C. § 1346(b)(1).

11. The parents of D.A. are entitled to recover $103,967.10 from the United States in a lump sum for past medical expenses and to pay off a lien.

12. The United States is liable and shall pay to D.A.'s parents or legal guardian the sum of $32,994,383.50 for D.A.'s future medical and attendant care. Payments for future years shall be made pursuant to MCARE, 40 Pa. Cons. Stat. § 1303.509.

13. The United States is liable and shall pay on behalf of D.A. the following in a lump sum:

> a. pain and suffering, loss of life's pleasures, humiliation, and disfigurement for the past and the future the sum of $5,000,000.
>
> b. for loss of earning capacity, based on attaining an associate's degree and working through his work life expectancy, the sum of $2,733,551.

c. for loss of the value of fringe benefits the sum of $820,065.

14. The aforesaid sums shall be paid into a trust fund account or other plan which shall be approved by both parties and submitted for approval by this court.

    s/Sylvia H. Rambo  
    SYLVIA H. RAMBO  
    United States District Judge

Dated: April 20, 2017